Good morning, Counsel. Good morning, Your Honors. May it please the Court, Jeffrey Victor for the appellant, Helen Schirmer, and I'd like to reserve three minutes for rebuttal. We'll try to help you, but keep your eye on the clock. Okay, thank you, Your Honor. Your Honors, if I may, I'd like to focus on two main issues in this case. There needs to be a finding that the appellee provided any type of bedside care, nursing care, or patient care, direct patient care. And the position that the appellant takes is that there does not need to be any type of finding that there needs to be direct patient care. Let me turn it around a little bit. Of course. As you know, at least I think, there are no allegations that Shadow Mountain employees knew about individual residents, their conditions, their care, and so on, as opposed to the Avalon employees. Did I miss that? Is there some allegation in the complaint that specifically mentions that Shadow Mountain employees knew about the individuals involved, their care, and so on? You mean Avalon Health Care? I apologize. That's fine. Avalon Health Care, the parent corporation, was aware of the building and was aware that the building would have residents or patients. The direct names of the residents or patients or whether they actually met with them in person, it's the appellant's position, is not relevant here, because if you look at the Corbett case and you look at the Adult Protective Services Act, ARS 46455, which cases have stated needs to be interpreted broadly, you don't need an actual finding that we are aware of this patient in our building. So I gather your construction of the act that you mentioned is that just corporate ownership alone and control of a budget is enough to make the parent corporation liable in a case like this. I agree, but the facts in this case go way beyond that, because they make up the budget, they make up the staffing. When you say they make up the staffing, I'm a little blurry on that. Does that mean they select the people who are going to be on the staff, or does that mean that they do the budget that sort of puts the parameters of how much staff they can have? That's a very good question. What they do is they allocate how many people are going to be at that building in terms of staff. The staff went for many months and during this entire time went without an ADON, Assistant Director of Nursing. They could not get an Assistant Director of Nursing position filled unless Avalon Healthcare would give approval. But Avalon Healthcare did more than just make up the budget. They did the hiring, they decided what the rates of pay would be, and obviously if you're going to pay a CNA, a Certified Nurses Assistant, or an RN, or an LPN, two or three dollars more per hour, you're going to attract, for lack of a better word, a better caliber of applicants, which translates into patient care. Well, I guess I understand that, but we have lots of, our employees are subject to categories and grade levels and all of that, but that doesn't mean that the administrative office actually employs all of those, does the hands-on employment of all of our law clerks, for example. So I'm just not understanding whether the grandparent company decided who the people were who were to be hired, or whether they just decided the pay categories in the budget. You can't have an ADON. If you need a van driver to go to dialysis, to take patients to dialysis, we have to make that decision. That's in the record. If you want to attract more experienced applicants who have worked in different buildings and have 10, 15, or 20 years worth of experience, it's going to be a higher rate of pay. We're going to curb the rate of pay, and then they made decisions about equipment. Equipment that is directly related to patient care. Now, this is a full case. Let me be sure I understand. Of course. I gather you would admit that under Arizona law, you have not pled alter ego liability, right? Not in the complaint. Not in the complaint. Okay. So what we're really talking about is the implications of the act, right? Right. And you believe the act should be construed very liberally, and that there is no requirement that the parent company actually know and be involved in the care of the individual patient, right? Well, they actually are. If you look at the health care forms that have Avalon Health Care on it, and if you look at Yeah, your position is that they are involved. They are. Not that they need not be, but that they are. They are. There's a risk for fall assessment form, and I can give you the ER. It's ER85 and ER98, where it tells the building staff, the nursing staff, to rate the patient's risk of falls. It says a score of 10 or more indicates a high risk. Then the form, which again was drafted by the appellee, says, and must be care planned. So they're dictating the care to the staff in the building. So let's take your particular client, Sherman, I guess, right? Right. Where is the allegation that the parent company made specific decisions regarding staffing or care about your client? Your client's husband. The allegation is in the complaint regarding the care of Mr. Sherman while he was a patient there, and the record, the forms, the testimony that came from the depositions from Michael Morris, from the DLN, it all points in the direction, at least in the light most favorable to the plaintiff, at least for a question of the prior effect, did this parent corporation orchestrate, have a hand, have a say, have involvement in activities which translate into patient care? To your client? To my client, yes. My client did not have a bed pad alarm, which would indicate whether or not he's getting up, and because he's a high risk for fall patient. The DLN testified she asked for bed alarms and only would get so many as authorized by corporate. Corporate, in this case, is Avalon Healthcare, clearly had a role in patient care. So I gather your claim is that they had a role in that they made financial decisions that lessened the quality of medical personnel, lessened the amount of care given to individual patients, but may or may not have known about Mr. Sher personally, right? Well, there's nothing in the record to show that they directly knew of him by name. Right. So that's where I get back at you. You're saying that they're involved in that they controlled the amount of money spent and therefore it affected personnel and services and so on. But other than that, they may have no idea who Mr. Shermer was, right? You're correct, but in my position this is not required. Oh, I understand your position, yeah. But you're also, if I understood what you just said, you're also contending that they knew that their budget decisions were affecting specific healthcare provisions or lack thereof. Lack of provisions in certain circumstances. Sure, how could they not? If the DON asks for 50 bed alarms... Well, no, no, I just want to make sure I understand what you're saying. That's an excellent question. But when they're only getting approved a small number of bed alarms for patients that are at high risk for falls, they know that the decisions that they're making is directly affecting patient care. When they're deciding, well, we're going to get a van driver, we're not going to get a van driver for patients that need to go outside for dialysis, they're making a decision that directly relates to patient care. There were many decisions here. When they're not going to approve an assistant director of nursing who oversees patient care in part, again, they're making a decision that directly filters or affects patient care. They knew that. And they were the controlling entity. They were controlling the budget, the finances, the staffing, the hiring decisions. Like I said, the ADON. This is not some company that's far removed from the day-to-day affairs or the day-to-day ongoings of patient care. They were overseeing it. So under your view, under the Corbett case, they talk about those who cause or permit abuse, neglect, or exploitation. You believe that by underfunding the operation of this health care center that they permitted what happened to your client. Is that your position? Oh, sure. If they're cutting corners with staffing for these elderly people that are in need, if they're cutting corners with not having an ADON in the building to oversee the quality of care for the patients, if they're cutting corners by not authorizing supplies or equipment that patients need, especially high-risk fall patients, they certainly are. They're making business decisions which affect the patients in that building and their needs and their care. You believe that since we're construing Arizona law here, and this involves, Arizona has a lot of health care facilities, do you believe this is an issue that should be certified to the Arizona Supreme Court for determination there? Well, it has been addressed in some of the cases in the Arizona Supreme Court, but my position is there was ample evidence on the record and established and brought out in the depositions to at least, at a very minimum, create a question of fact for the trier of fact as to whether or not Avalon had a role, had a say, had their hands in the day-to-day care of patients like Mr. Sherman. Isn't that the issue, whether they had a role in the day-to-day care? That's how you see it? That's what I think it comes down to, basically. And how could they not when they're— Your view is that if they determine the budgetary constraints and the nature of the limitations that they make on personnel, that that is participation in the day-to-day care. Oh, very much so. And the patients are the ones that suffer from that because they get shortchanged. If I understand correctly, you just sued the Parent Corporation and not Shadow Mountain. Is that correct? In this case, correct. Why is that? Because Shadow Mountain, the building had been sold. Avalon Health Care had three buildings in the state of Arizona. By the time, from what I understand, by the time I got involved, the buildings had been sold and the Parent Corporation was the one that was benefiting from that. So basically, Shadow Mountain had no money. There was no point in getting a judgment against it. It's not part of the record, but later on, it was represented that the buildings were sold and there wasn't much, if anything, there, basically. I understand. Your Honor, there's a few other issues here. You're welcome to make them, but do you want to save any of your time? Yes, I will. Thank you, Your Honor. Very well. Let's hear from the appellee. Good morning. May it please the Court, I'm Blake Miller. I represent Avalon Health Care Inc., and with me today is Craig Howe. Your Honors, the District Court was correct in granting summary judgment because there is no evidence whatsoever that this particular great-grandparent, this particular defendant, did anything at all or failed to do something it should have done regarding Mr. Schirmer, and that defect runs throughout the entire case. This is not a case where— Let me ask you a— Certainly. This is a hypothetical, but supposing, hypothetically, that people at the facility, the employees at the facility, with knowledge of the situation, said to Avalon, we can't guarantee a proper health care unless you expand your budget and let us hire X, Y, and Z, and Avalon, for financial reasons or whatever, said no, and then the very health care problem that the people had predicted occurred, are you saying Avalon would not be liable in that obviously more extreme situation than what's presented here? In an appropriate case, the entity that actually controls the nursing home can be liable under both state and common law. The problem in this case— But Avalon's the one that controls the budget, is what we're being told. No, not at all. It doesn't control the budget? No, no. Okay. And there's no evidence that it did. What's happened in this case is plaintiffs have referred to terms like corporate, or corporate office, or they, or the higher-ups, and when questioned to deponents, there's only two deponents that even was questioned on this issue, Michael Morris, who was the former administrator of the nursing home, and Ms. Holmes, who's the former director of nursing, and plaintiff's counsel has questions such as corporate. Did corporate do something? Did corporate have input? What about corporate office? What about the higher-ups? Did you need to seek permission from the higher-ups to buy a van? Objections were made in those depositions. You're not defining who that entity is. They continued. At no point in this record is they, corporate, corporate defendants, ever linked to this particular great-grandparent. Never. Not a single time. And that's the point the district court focused on when it said there's nothing linking Avalon Healthcare, Inc. to this facility. It's four links up. Rather than sue the nursing home, and there's nothing in the record indicating I mean, it's four links up. You mean they own, their, their subsidiary held the nursing home as an asset, or it's another level? And I don't know how much the organizational charts in the record, but the way it goes is Avalon Healthcare, Inc. owns a subsidiary, which owns the leaseholds, which owns another entity that owns the nursing home. I'm sorry, I skipped a step. It goes leaseholds and the nursing home. It. And who's corporate? I have no idea. There are entities, again, this isn't in the record, that do management. They were later sued. Not in this case. And they are not Avalon Healthcare, Inc. And that's the problem here. For rather than sue the nursing home, and there's nothing in the record indicating that was the reason. There is coverage, and I have no idea why the nursing home wasn't sued. They go to Utah and pick an entity which is way up the corporate chain in a different area and say, that's corporate. Well, let's just assume that they do have some budgetary control. This entity. That it is corporate. That's who they were referring to. Is that enough? If the budget is such that the nursing home can't provide adequate care to all of the patients that are in it? It comes to the issue, assuming corporate is this entity, it comes to the issue, well, I guess whatever entity would be that. The degree of control they exercise over budget. Michael Morris testified that they gave him input, data. When you set budgets, you look at historical. And he got from, well, the question was, did you get that information from corporate? Yes. That's not setting a budget. But if that entity said, I am going to restrain you, or you can only spend X dollars, and even if that affects care, it doesn't matter. There's liability for that under both APSA and common law. That's not our case, and that's certainly not Avalon Healthcare Inc. So basically, your primary point is, even if the plaintiff in this case, the appellant in this case, is correct about the effect of monetary constraints and so on, it doesn't really matter, because they've never really identified that Avalon had this control, that it was, in quotes, corporate. It was all very vague and indefinite, and there are other levels that were not mentioned, that if indeed there was control, it was them, not Avalon. Exactly. In fact, there wasn't even a single officer, director, or employee of Avalon Healthcare Inc. identified in this case, in discovery, ever. And a corporation can only act through those kind of individuals. An act of an individual representing Avalon Healthcare Inc. never even was cited. The only connection, the only connection Avalon Healthcare Inc. had was its name appeared on some forms. And these forms are used for basically recording nursing information. And the district court was right, because providing forms is simply different than rendering care. And the district court properly understood that. Well, I understand that, but I'm still trying to get to a more interesting question, which is, I understand your answer to the question of whether or not, if they set the budgetary constraints on the nursing home, this defendant, is that sufficient to, to, to make sure that they create, create potential liability? It can be if the budgetary constraints reach down so far as to regulate care. Back office type of considerations do not equate to care. Like, let's say a law firm, the person running a law firm's billings don't practice law. But if that back office says, you can't hire a court reporter, you can't file an answer, we won't give you the money to file a jury demand, that's restraint. Or if they said you have to have 500 patients and they give them a budget that is sufficient to take, provide care for 200, I guess that would be. Exactly. And in this case, there's no evidence that that type of budgetary control existed. But we don't even have to get there, because as to Avalon Health Care Inc., there's not a shred of evidence other than its name on forms. It did anything. So it's a complete failure of proof from your perspective, right? Absolutely. And that's why certification to the Arizona Supreme Court probably doesn't make sense, because it's a lack of, it's a, it's a Celotex case. Absolutely no evidence. You mentioned there was coverage in terms of Shadow Mountain. Did Shadow Mountain have, I guess we call it, malpractice coverage? Did they ever sue Shadow Mountain to take advantage of that? Again, I don't believe this in the record, but plaintiffs later brought an action against the entities that actually were involved. The nursing home, the management company, the administrators, that's a separate case in the state court. As of this case, we, since day one, in the answer and through discovery and in depositions, we've maintained the same statement. Not the right entity, people. You don't have the right one. And it was on that basis that really the district court rendered its opinion. Causation also was a factor as to the wrongful death. Let me address that really briefly, Your Honors. What Mr. Schirmer died of was an aortic dissection. It's basically a separation of the aorta. It's a very catastrophic event. The blood goes into the chest cavity. It is not a good thing. Their only disclosed expert in Arizona in a malpractice case, you have to have an expert, and there's only one expert per issue. State rules. And you need to tie in both proximate cause and standard of care. That was Dr. Horaback, Horaback Carson. When I took her deposition, it's in the record, she declined to tie in anything the nursing home did or didn't do that resulted in aortic dissection. No connection whatsoever. Just declined to go there. That is, again, four steps removed from what this great-grandparent may have done or not done. If the nursing home can't be tied into it, certainly my client cannot. Let me briefly address the death certificate because that was raised in the briefs, Your Honor. Somehow that the death certificate is sufficient to excuse the requirement to submit medical testimony. Under Arizona law, as I indicated, that's absolutely required. And that lie together with the federal rules of civil procedure requires disclosures, facts and opinions upon which they're based under Rule 26. The argument seems to be that a death certificate standing alone simply excuses that. The district courts wasn't presented with that. It was never argued. Under the Whitaker v. Executor case, that has been waived. But note, Your Honors, that under Arizona, the statute says that a death certificate, this facts contained within a death certificate are prima facie evidence. The facts. Even in the briefs, the appellants argue that what they're seeking is the opinion of cause of death in the death certificate. Under the statute, only facts are presumed, not opinions. What the plaintiff has for an expert disclosure basically is a general statement that a hip fracture can lead to loss of mobility and can affect life expectancy generally. And as a general rule, we would agree with that. It's just like saying that smoking cigarettes can affect your life expectancy. I would agree with that as well. But if that smoker later dies in an auto accident, there's no cause, approximate cause between the smoking and the death. And that's the type of situation we have here. He's, Mr. Schirmer suffered a catastrophic event. His aorta separated. He bled out and he died. There's no connection to the nursing home that he stayed at earlier and there's certainly no connection to his great grandparent. A couple additional points, your honors. Dr. Horn's opinion is not clear in the appellant's briefs. That was a late submittal to try to get his expert opinion in. The district court rejected it. That has never been challenged. So as we sit here today, the discretion to reject that stands. Same with Dr. Lance Ewells. That was a late filed report not considered by the district court. Is there alter ego? Never pled, never asserted. And even more importantly, alter ego is an attempt, by alter ego you are setting aside disregarding the corporate veil of an entity. It needs to be a party. By not suing the nursing home, you can't get alter ego for an entity you don't sue. I believe that covers our points. If there's any questions, if not, I'll. Any other questions? I think not. Thank you, counsel. Thank you. Your honors, one thing that Mr. Miller did not point out, when asked, or he brought up that there was a separate case that was filed subsequently against the building and its administrator, that case was dismissed. It's on appeal in state court, but that case was dismissed, so I wanted you to know that. What was not brought up was the affidavit of Lance Ewells, which is ER, I believe it's ER44. In ER44, which was disclosed, Mr. Ewells was an administrator expert that was disclosed in a timely fashion. He did an original report and then he did a supplemental report by way of affidavit after John Teague's report. Now, he says, he refers to Avalon Healthcare as the corporation. Wait, wait, wait. Sure. In the record, he refers specifically to Avalon, or did he refer to corporate? In his report, which is part of the record, he refers to Avalon Healthcare Incorporated, the appellee in this case, as the corporation. He says that pursuant to the federal regulations, Avalon Healthcare Incorporated, the appellee, is the governing body of Shadow Mountains. There is evidence in the record that we all are talking about the same corporation. How can an expert opine on that? That's a question of law. I'm sorry? How can an expert opine on that? It's a question of law. What the regulations show or do not show. Your adversary says that numerous times during the deposition, you put questions referring to corporate and that he objected and said it's ambiguous what you mean and you declined to change your question. Is that correct? No. I don't think the record shows that he objected and said it was ambiguous. I said corporate and I said the corporation in Salt Lake City. Everyone knew who we were referring to here and Lance's reports bear that out. It's Avalon Healthcare. That would be an all due respect. That would be gamesmanship to say, well he didn't mention Avalon Healthcare as the corporation. Therefore, we don't know who we're talking about. Well, the record from Lance Ewell shows that. Okay. I think your time is up. Any other questions by my colleagues? We thank you all for your argument. The case just argued is submitted.
judges: Schroeder, M. Smith, Rakoff